PETER OLSON, Respondent, v. JOHN A. WETZSTEIN, and Frank E. Wetzstein Copartners Doing Business under the Firm Name and Style of Mandan-Bismarck Bus Line, Appellants.

(225 N. W. 459.)

Opinion filed May 3, 1929. Rehearing denied June 6, 1929.

*O'Hare, Cox & Cox,* for appellant.

*Crum & Crum,* and *Scott Cameron,* for respondent.

Burr, J. On August 12, 1925, the plaintiff was at Fair View cemetery, Bismarck, watering flowers and setting stakes around a grave. After finishing his work he took his daughter with her two infant children in his Ford coupe for a drive through Bismarck and along the highway to Mandan. About 9 P. M. as he was returning from Mandan, on the highway between Mandan and Bismarck he came into collision with an automobile bus owned by the defendants and operated between these cities. The highway is paved and has a division line running lengthwise through the center.

In his complaint the plaintiff alleges that this collision was caused by the carelessness of defendants' agents, and by reason of the said collision his automobile was wrecked, his left arm broken, he was injured "in and about the head, neck, back, side and leg" and that the collision "did permanently injure the plaintiff and cause him to suffer great pain for many days thereafter." He says that the value of his automobile, at the time it was destroyed, was $400; that he was compelled to pay $150 for medical attendance, nurses and hospital fees and will be for a long period of time unable to engage in any gainful occupation whatever; that his earning capacity has been greatly and permanently reduced." So he asks judgment for $10,500.

The defendants admit there was a collision at the time and place mentioned but allege this collision was caused by the negligence of the plaintiff and that their bus was injured in the sum of $200. So they ask for judgment against the plaintiff for $200.

The case was submitted to a jury, a verdict returned in favor of the plaintiff for $4,031.80 and judgment entered for amount and costs. No motion for a directed verdict was made at the close of plaintiff's case or at the close of the entire case; but after the verdict was rendered the defendant moved for judgment notwithstanding the verdict

or for a new trial, with specifications of error in support of the motion in substance the same as are specified on this appeal. This motion was denied, and the defendants appeal.

There are fourteen specifications of error. These may be divided into four classes—first, five dealing with the admission or rejection of testimony; one, with submitting to the jury the question of the permanency of plaintiff's injuries, two on excessiveness of the verdict; and six dealing with failure to grant a new trial, etc., being based upon the sufficiency of the evidence.

During the trial of the case the court permitted the plaintiff to testify as to a certain "growth" on his hand; allowed one witness to tell about how far a spare tire carrier "stuck out" on the side of the omnibus; allowed another to testify as to certain "skid marks" which he observed at or near the place of the collision; another to testify as to the condition of a certain tire carrier two days after the occurrence; and struck out the testimony of another witness who was testifying as to the inability of the plaintiff to find the place of accident. This comprises the first class of error specified.

Among the injuries which the plaintiff sustained was a broken arm. In showing the arm and hand to the jury attention was called to a "growth" on the hands in the vicinity of where his hand was injured, and which appeared about a year after the accident. The only testimony as to this growth is that of the plaintiff. He did not say what was its cause, or its nature, or what effect it had upon the hand. We do not know whether it is a wart or what it is. The plaintiff said that he had not "the power to hold things with that hand;" but did not intimate the growth had anything to do with this. There may be a suggestion that the growth was a result of the accident. The court overruled the objection to this testimony. There is nothing in such testimony to affect the jury for there is nothing to show that this growth was in any way harmful, contributed to the present condition of the plaintiff, or was the result of the injury. At the very worst it was immaterial.

A witness by the name of Zandvliet testified that the day after the accident one of the defendants brought in a tire carrier to be fixed, and told him it was from the bus in the wreck, and from the appearance of the carrier he figured how far it must have "stuck out." He was

allowed to testify to this and gave his opinion as to the distance from the side. There was no question but what it was a carrier from the bus that was in the accident and that the carrier stuck out some distance. The bus was not there for examination, but was in Minneapolis. The defendants did not attempt to controvert it. The carrier would have to project some distance to allow the spare tire to be placed thereon and we see no error in the action of the court.

Witness Brown came to the scene of the collision about five minutes after the accident occurred. He showed he had investigated several accidents before; that by the light of the attendant cars he could see tire marks on the pavement at the place where the car stood; and could distinguish between the narrow skid marks of the Ford coupe and the wider marks of the bus tires. He testified among other things, that the narrow Ford tire marks began on the south side of the highway at the right of the division line of the pavement, from a foot and a quarter to two feet from the center and out on the edge of the pavement. There was an objection made and all of the testimony regarding what he saw was stricken out except such as referred to the tire marks. The witness was at the scene of the accident almost immediately after the collision occurred, and the question of the position of the cars at the time of the collision had a bearing upon the question of negligence and contributory negligence. It is true the Ford wreck had been removed, or was removed about the time he came there, but he was testifying as to the "skid marks." The jury had a right to know these facts and could judge whether they were marks made by these vehicles. We see no error in permitting this testimony.

Fay Harding, a member of the board of railroad commissioners, made an examination of the bus two days after the accident. He said he "found there was a tire carrier on the left side of the vehicle, approximately midway between the front and rear and projecting beyond the running board of the vehicle. . . . I estimated the distance between the inside of the tire and the line on the outside of the running board to be a distance of approximately four or five inches." Defendants say it was error to receive this testimony, because there was "nothing to show that the bus was in the same condition on that day as it was on the day of the accident." There is no merit in this objection. There is nothing to indicate there was any change in the

bus during these two days. The defendants had it within their own power to show there was a change. There was no harm in permitting him to state what he found at that time, when there was no indication of any change.

The testimony of a witness Rowe was tendered by the defendants to show the probability that plaintiff was drunk when the accident occurred. The plaintiff had testified he drank no intoxicants that day. It seems that in the first forenoon after the accident the plaintiff with one Casselman was looking for the place of the collision. The witness said he saw them pass back and forth in a car as if looking for something. He told them where glass could be found and they told him that was what they were looking for. This was offered to show the probability that the plaintiff was drunk at the time of the accident. On motion the testimony was stricken out. There was no error in rejecting the testimony.

In charging the jury the court said, among other things:

"If you find for the plaintiff you must determine that in the exercise of sound judgment, and you may take into consideration, in connection with the damages done to the automobile, the pain and suffering of the plaintiff, or whether or not there was any pain or suffering, and you may take into consideration whether plaintiff's injury was temporary or permanent. You may take into consideration his loss of time. These things you will taken into consideration in determining how much damages you should assess for personal injury."

Appellant says it was error to submit to the jury the question of permanent injuries, that the evidence conclusively shows the injuries were merely temporary. The plaintiff did not offer medical testimony but the defendant had three doctors who testified from their examination of the plaintiff. Dr. Waldschmidt testified that he saw the plaintiff immediately after the accident; that he had some pain, had one bone broken in his arm and "there were some lacerations over—under the forearm—the left forearm, and there were lacerations about the knee." Dr. Bodenstab testified that he made a physical examination at the request of the plaintiff about January 26, 1926; that at that time he "found the evidence of a former abrasion on the right knee. And I found a slight limitation of motion in the left wrist. Outside of the X-Ray findings, that is all that could be determined." He further

said that "there was nothing wrong except a slight limitation in the motion of the wrist;" that he found "evidence of an old fracture of the left ulna. . . . At the junction of the upper and middle third of the ulna. Well healed and in good apposition." He said there was "a very good calloused formation," and that he found nothing abnormal of the shoulder joint. He said "there was a slight limitation of the wrist joint. . . . The extension, throwing the hand back was perfect, but flexion was incomplete. Flexion was not complete. There was about ten per cent limitation of that motion." He said that if the usual ankylosis was the result of a splinting the movement would be gradually restored by the use of the arm. When asked "Are you able to state at this time whether or not the impairment to the wrist is due to the break in the arm?" He answered: "Nobody can definitely state that." He said that the break of the arm was a "transverse fracture— a break directly across the bone. Squarely broken off, in other words." He said he would judge the plaintiff was "about ninety per cent normal," and apparently "traveling on the road to normality at that time."

On the demand of the defendants, and by order of the court the plaintiff submitted to an examination by Dr. Stackhouse. He agreed to the examination. Dr. Stackhouse examined the plaintiff on June 18, 1928, almost three years after the accident. He stated he found the left arm "normal in appearance," and "normal in function," that plaintiff had a good grip in both hands, the right hand was a little bit stronger than the left, that plaintiff was a right handed man; that he had an X-Ray taken and found "normal function and normal action and normal extension," of the "elbow and wrist and fingers and joints;" that he would say at the time he examined him there was no disability. He said however that from his examination, excluding the X-Ray, he could not swear that he had a fracture. From the X-Ray picture he would say plaintiff had a good strong calloused formation. He could find no disability at the time of the examination. He would not say that the break had impaired the arm but that the arm was practically as good as ever though it was possible that some pressure or inconvenience would result therefrom; with possibility of a slight disability. He admitted that where a man like the plaintiff, fifty-five years of age at the time of the accident, had a break it would take several months

for the union to be completed and that the nonuse of the arm for several months would be apt to weaken the muscles of the arm. But as he had only seen the man once he could not tell how long it would take for a man of his age to get back strength in that arm. The plaintiff had testified to continuous weakness of the arm—weakness existing at the time of the trial and which appeared to show no improvement—and inability to lift and grip as before. He was not required to submit medical testimony on his own behalf, though the absence of such testimony could be considered by the jury. The jury had the right also to consider the uncertainty expressed by the physicians as to the future. The rule as to experts stated in Axford v. Gaines, 50 N. D. 341, 195 N. W. 555 is applicable here. It was proper for the court to submit the character of the disability to the jury and leave it to the jury to determine whether under all the circumstances of the case, the injuries would probably continue over such a length of time as to be termed permanent in the common vernacular.

It is alleged that the evidence is insufficient to sustain a verdict for the plaintiff and therefore the court erred in not granting a new trial, and in entering judgment for the plaintiff. This is based upon the testimony. It is not necessary to review the testimony. Everyone conceded there was a collision in which the plaintiff was injured and his car wrecked. It became a question whether this was caused by his own negligence or the negligence of the defendants or whether his own negligence contributed to the result. There was square conflict of testimony on these points and the jury found that the collision was caused by the negligence of the agents of the defendants and that the plaintiff was not guilty of contributory negligence. The court therefore was justified in denying a new trial.

The last objection deals with the amount of the judgment. Defendants say it is excessive, that under no circumstances should it exceed $1,500, that all the plaintiff proved was loss of three months time valued at $600, $300 for his automobile, $100 for his doctor and hospital bills and $500 for pain and suffering.

There was testimony which if believed, would justify the jury in arriving at the conclusion that at the time of trial almost three years after the accident the plaintiff was still suffering from disability and therefore that his loss of time should not be limited to three months.

The plaintiff testified that at the time of the accident he got a small hole in his left knee, that the knee became black and blue and he was "sore and bunged up all over," he suffered pain for three months, he could not use his arm as before, hand seemed numb, could not lift it as before and by reason of his trade he had to lift big plate glass, did not have the grip with his left hand that he had before, and he was fifty-five years of age when the accident happened. He also stated his car was worth from $350 to $400 and became a total wreck. He had the car two years and had paid $300 for it. He said he paid out over $100 to doctors, nurses and for help while incapacitated. He was taken to the hospital from the place of accident; but did not remain there long as he could not afford to stay in the hospital. Just why the defendants should limit the pain and suffering to $500 is not clear. Pain and suffering are not measured by any set monetary standard for there is no market price for such conditions. It may be the jury was fairly liberal in its allowance, but this matter is for the jury to determine in its sound discretion. The case had been tried before and the former jury had allowed $5,500. There were conditions which arose on that case which might be said to prevent the verdict from being any criterion. However, we cannot say the amount allowed was so excessive as to justify interference with the decision of the jury. The trial court did not think so and his judgment and discretion are of value to this court in determining such a question.

Finding no error the judgment is affirmed.

BURKE, Ch. J., and NUESSLE, BIRDZELL, and CHRISTIANSON, JJ., concur.